UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: Robert B. Keeran, and
Cynthia J. Keeran,

       Debtors.

Case No. 09-12021-j7

---

Siekap Kim, and
Kyung S. Kim,

       Plaintiffs

       v.

Robert B. Keeran, and
Cynthia J. Keeran,

       Defendants.

Adversary No. 09-1208-j7

## MEMORANDUM OPINION

This matter is before the Court following a trial on the merits of the Plaintiffs' claims objecting to the Defendants' discharge and to dischargeability of a debt. The Plaintiffs allege that Defendant Robert Keeran committed fraud by misrepresenting that he had an ownership interest in property, and then selling that illusory interest in the property to Plaintiff Siekap Kim and bilking $80,000 from him as a down payment. Plaintiffs thereby claim that Defendants owe a debt to them to repay the $80,000 and that such debt is non-dischargeable under 11 U.S.C § 523(a)(2)(A). Plaintiffs further allege that the Defendants have not provided adequate documentation and have not satisfactorily explained what happened to the $80,000 that the Plaintiffs paid the Defendants pre-petition. The Plaintiffs thereby object to the Defendants' general discharge under 11 U.S.C. § § 727(a)(3) and (a)(5). Finally, the Plaintiffs assert that the

Defendants knowingly and fraudulently undervalued a warehouse in their statement of financial affairs and therefore should be denied a discharge pursuant to 11 U.S.C. § § 727(a)(4).[1]

The Court, having considered the evidence presented at trial, the arguments of counsel, and the relevant case law, and being otherwise sufficiently informed, has determined that the Plaintiffs have failed to prove their claims.

**Jurisdiction and Venue**

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) & (b) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) & (J). Pursuant to Fed.R.Civ.P. 52 made applicable by Fed.R.Bankr.P. 7052, the Court now states its findings of fact and conclusions of law.

**FACTS**

Defendant Robert Keeran ("Bob Keeran" or "Mr. Keeran") was a real estate developer whose various business enterprises rendered him and his family, including his wife, Cynthia Keeran, Mr. Keeran's co-debtor under Chapter 7 and co-defendant in this case, insolvent. Unfortunately, Plaintiffs Siekap Kim ("Mr. Kim") and Kyung Kim, husband and wife, had an investment with Mr. Keeran at the time the Defendants commenced their bankruptcy case.[2] That

---

[1] At trial, Plaintiffs sought to expand the scope of their claims to include a claim under 11 U.S.C. § 523(a)(4). No claims under that sub-section were included in the joint pretrial order (*see* Docket No. 64), and the Plaintiffs produced no evidence that such claim was erroneously excluded from the pretrial order. A pretrial order "controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d), made applicable by Fed.R.Bankr.P. 7016. A final pretrial order may be modified "after a final pretrial conference only to prevent manifest injustice." Fed.R.Civ.P. 16(e), made applicable by Fed. R. Bankr. P. 7016. Because the purpose of a pretrial order "is to clarify the real nature of the dispute at issue, attorneys at a pretrial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be." *Youren v. Tintic School Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003), quoting *Rios v. Bigler*, 67 F.3d 1543, 1549 (10th Cir. 1995) (internal quotation marks omitted). The Defendants did not have fair notice that the Plaintiffs intended to assert a claim of non-dischargeability under 11 U.S.C. § 523(a)(4). Allowing the Plaintiffs to expand the scope of the objection would have deprived the Defendants of a fair opportunity to present their defenses. For these reasons, the Court did not permit Plaintiffs to expand the scope of their 11 U.S.C. § 523(a)(4) claim at trial.

[2] Plaintiffs filed a Chapter 7 Voluntary Petition on May 12, 2009. *See* Bankruptcy Case No. 09-12021-j7.

investment and the events surrounding it precipitated the allegations at issue in this memorandum opinion. The Court begins by examining the underlying facts.

*Bob Keeran and Siekap Kim*

Of the actions discussed below, insofar as they are relevant to the Plaintiffs' claims in this adversary proceeding, most were primarily conducted either by Mr. Keeran or between Mr. Kim and Mr. Keeran. A substantial number of their relevant business communications were done orally or "on a handshake."

Bob Keeran is a licensed contractor and licensed realtor operating in the Albuquerque metropolitan area.[3] He has held his contractor's license for over a decade and his realtor's license for approximately thirty-five years. At the time of the events in question, Mr. Keeran and his wife were the sole shareholders of a number of real estate development corporations,[4] which Mr. Keeran operated. Mr. Keeran is a sophisticated developer, having conducted at least three projects in the $10 million dollar range, which is a sizeable deal in the Albuquerque real estate market. Although Cynthia Keeran is a shareholder in these corporations, a joint debtor in the underlying bankruptcy case, and co-defendant in this adversary proceeding, she has minimal knowledge of the Defendants' finances. The Defendants' businesses had a relatively substantial number of revolving loans and lines of credit. Prior to the economic downturn that began in 2007, it was not unusual for the bank accounts for corporations the Defendants own to have millions of dollars flowing in and out each month.

The Defendants have three adult children, Matthew, Drew, and Jennifer. Matthew Keeran owns his own construction business. Drew and Jennifer are disabled with what is

---

[3] Mr. Keeran is also a non-practicing doctor of dental surgery.
[4] Debtors' schedule B lists joint stock ownership in six different corporations related to real estate development. Debtors' Statement of Financial Affairs cites income from at least eight different corporations related to real estate development. *See* Plaintiffs' Exhibit 12.

-3-

commonly known as the "Fragile X" Syndrome. The Defendants, prior to commencement of their bankruptcy case, would assist Jennifer in paying her mortgage. Drew is more severely disabled and lives with the Defendants, who are responsible for his care.

Siekap Kim, who at the time of trial was 66 years old, emigrated from Korea[5] to the United States in 1983. He and his wife, Kyung Kim, own a 24-room hotel business in Grants, New Mexico. The Plaintiffs also have three adult children, all in their thirties. Although the $80,000 debt the Kims seek to be found non-dischargeable was described by their counsel as their "life's savings," they have over $1 million in unencumbered assets according to a loan application. *See* Defendant's Exhibit C, page 64.

### *Mr. Kim and Mr. Keeran Make and then Orally Terminate Their First Deal*

Mr. Kim and Mr. Keeran first met in 2005, whereupon they conducted and terminated, prior to its completion, a real estate deal that preceded the one which is the subject of this litigation. The Kims had previously purchased a house in a subdivision called Ventura Village, which had been built by one of Mr. Keeran's companies. While Mr. Kim was visiting the house one day, he met Mr. Keeran, whereupon the two struck a deal wherein Mr. Kim would purchase yet another lot in the subdivision (the "Estrada Court Lot"), this time from one of the Defendants' companies, Llave Construction, Inc., for $175,000. This was memorialized in an "Agreement for Sale and Purchase of Lot 4 of Estrada Estate" on October 13, 2005. Mr. Kim, pursuant to this contract, also put up $5,000 in "earnest money," which was paid to a third-party title company. *See* Plaintiff's Exhibit 19. Mr. Kim was granted title to the lot by another one of Mr. Keeran's companies, Llave Development, Inc. *See* Exhibit 20, "Warranty Deed". On November 24, 2006, Mr. Kim and Llave Construction, Inc. entered into a Building Contract,

---

[5] Mr. Kim did not state whether he was from North or South Korea. This fact does not matter for the purposes of this trial.

-4-

wherein Llave Construction, Inc. contracted to build a home, and Mr. Kim agreed to obtain a construction loan in the amount of $600,000 upon which Llave Construction, Inc. could draw. *See* Plaintiffs' Exhibit 19. Mr. Kim applied for and received approval of this loan.

In 2007, for whatever reason, Mr. Kim decided that he no longer wanted to own the Estrada Court Lot or have a house constructed on the lot. Testimony conflicted: Mr. Kim testified that he could no longer afford the mortgage payment; Mr. Keeran testified that Mr. Kim had represented that he had had a heart attack and could not bear the emotional burden of being obligated to pay so much money. Mr. Kim testified that Mr. Keeran misunderstood him and made the erroneous assumption that Mr. Kim had had a heart attack. English is not Mr. Kim's first language, and Mr. Keeran does not speak Korean; this Court finds it not unlikely that the parties were unable to fully understand each other at any of the times relevant to this case.

In any case, entirely on the basis of an oral agreement and completely without objection, Mr. Keeran allowed Mr. Kim to terminate the contracts for purchase and sale of the Estrada Court Lot and for the construction of a house thereupon. In January and February 2007, Mr. Keeran caused the Kims to be paid back all of the money they had invested in the Estrada Court Lot deal. *See* Defendant's Exhibit I. The Kims conveyed the property in question by warranty deed to yet another company of the Keerans, Llave Enterprises, Inc., in August 2007. *See* Exhibit 21. Mr. Keeran testified that he ultimately took a financial loss on this property. Additionally, the Court notes that it was not unusual for Mr. Keeran through his companies to conduct substantial business on the basis of oral agreements. In addition to his oral contracts with Mr. Kim, Mr. Keeran let Karen Hall, a construction loan officer whom he had known and worked with since 1995, and her husband out of a contract three weeks before they were to close on a house Mr. Keeran had built for them.

-5-

Case 09-01208-j    Doc 69    Filed 04/06/12    Entered 04/06/12 12:16:23 Page 5 of 19

### *Mr. Keeran's Businesses Approach Failure*

Around the time that the Kims executed the warranty deed to transfer the Estrada Court lot back to Mr. Keeran's company in 2007, the worldwide economy began to enter into a deep recession, one which would engulf the real estate market and result in the failure of an abnormally large number of American banks. Mr. Keeran's ultimate financial downfall marched in lockstep with this recession. The Federal Deposit Insurance Corporation caused a change in control of at least one bank, Community Bank of Arizona, with which Mr. Keeran's enterprises did business. The bank then cut off a line of credit upon which he relied to pay his workers and demanded that he refinance the line of credit.

Mr. Keeran's business enterprises were very susceptible to disruptions in the credit market at that point. In late 2006, due to a concrete shortage and inclement weather conditions, one of Mr. Keeran's construction projections went approximately $1.5 million over budget. Mr. Keeran's interrelated businesses never recovered. He increasingly relied on letters of credit, revolving loans, and loans from his immediate family members to keep his businesses afloat. Mr. Keeran's increasingly resorted, to keep his businesses afloat, to taking a short-term loan from whatever source, often from a family member or friend, paying it off quickly with new funds that were made available (either via loans or payments from projects), then taking more loans. As the credit markets tightened considerably and the real estate market flat-lined, his businesses became increasingly more unstable and the Keerans were forced into bankruptcy in 2009. This is the backdrop against which a second deal between the parties unfolded.

### *Mr. Kim and Mr. Keeran Make Their Second Deal for a Lot at Rich Court*

The channel of communication between Mr. Kim and Mr. Keeran remained open after they mutually rescinded their first deal in late 2007. Mr. Kim was still interested in doing a deal

with Mr. Keeran, and Mr. Keeran, as explained, was hungry for revenue. Mr. Kim was aware that Mr. Keeran was struggling financially, but chose to go ahead. On May 1, 2008, the parties made an oral agreement for the purchase and sale of a second parcel of land in an Albuquerque subdivision called "Rich Court" for the initial amount of $187,500, which was the amount of the mortgage on the lot. Llave Enterprises, Inc. had title to the lot. Mr. Kim immediately made a down payment of $15,000, which he obtained by cashing a certificate of deposit. *See* Plaintiff's Exhibit *2.* Mr. Kim returned a few days later and stated that his wife would not pay more than $180,000 for the property. Mr. Keeran agreed to let him pay the lesser price, in exchange for Mr. Kim's promise to pay $80,000 total in "option money," *i.e.* money that would be non-refundable if Mr. Kim did not ultimately purchase this property. *See* Plaintiff's Exhibit 7, pp. 37-40. Mr. Kim tendered a check for the additional $65,000 that day. *See* Plaintiff's Exhibit 2. Mr. Keeran had never entered into an option contract before. At the time Mr. Kim paid the $80,000 toward the purchase price of the Rich Court lot, Mr. Kim was aware that Mr. Keeran was in desperate need of the cash and intended to immediately spend it.

Aside from simply being a poor business practice, the lack of a contract evidencing this agreement presents further difficulties for the parties in the case, as the Plaintiffs have asserted a fraud claim based on what Mr. Kim asserts he was promised in the bargain: At trial, Mr. Kim contended that Mr. Keeran promised him what was sectioned off as lot 4 ("Lot 4") in the Rich Court subdivision, a lot which Mr. Keeran did not own at the time. Mr. Keeran insisted that they had agreed on lot 9 ("Lot 9"). Lot 4 is located at 8815 Rich Court, Albuquerque, New Mexico. Lot 9 is located at 8808 Rich Court. Mr. Keeran contended that Mr. Kim did not express an interest in Lot 4 until months after making the original deal when Mrs. Kim decided she want Lot 4, and that Mr. Keeran told Mr. Kim he would try to swap Lot 9 for Lot 4 with another

developer once Mr. Kim paid off what he owed.[6] Beyond such contradictory testimony, little reliable evidence was produced on this point. The Court does note, however, that the Plaintiffs' initial filings, when they began to prosecute the claims asserted in this adversary proceeding, refer to Plaintiffs having agreed to purchase Lot 9. For example, the Plaintiffs' first substantial filing was a motion seeking an order authorizing a debtor's examination under Fed.R.Bankr.P. 2004. It alleged that "[c]reditors transferred $80,000 from their retirement funds to the Debtor Robert Keeran on a handshake for the purpose of purchasing vacant land located at 8808 Rich Court NE, Albuquerque[]." *See* Exhibit P (Docket No. 44 in case No. 09-12021-j7). At that point, any information Plaintiffs' attorneys had would likely have come from the Plaintiffs themselves. Additionally, when Mr. Kim applied for a loan to finance the rest of his purchase of the Rich Court lot, the property description on the loan application was described as "TBD," i.e. "to be determined." *See* Exhibit C.

Mr. Keeran was a credible witness. He provided substantive and consistent explanations of his actions. This is not to say that Mr. Kim was not credible. Given the language barriers between the two men, it does not require a leap of the imagination to conclude that there very well may have been a misunderstanding regarding which lot Mr. Kim believed he was ultimately entitled to receive. Nevertheless, the preponderance of the evidence shows that Mr. Keeran did not represent to Mr. Kim that the agreement inducing payment of the $80,000 was for the purchase and sale of Lot 4.

*The Kims' Money and Mr. Keeran's Financial Records*

Plaintiffs assert that Defendants failed to keep adequate financial records and to adequately explain what happened to the $80,000 they paid to the Defendants.

---

[6] At this time, Mr. Keeran also executed a promissory note whereby Llave Development, Inc. was declared to owe the Plaintiffs $80,000. *See* Defendants' Exhibit D. Mr. Keeran explained that he gave this note to Mr. Kim and pre-dated it so that Mr. Kim would have something to show his wife, who was angry with him over the Rich Court deal.

-8-

Mr. Keeran deposited the $15,000 check Mr. Kim gave him[7] into a Bank of Albuquerque account in the name of his wife, Dr. Cynthia Keeran Ph.D. *See* Exhibit G. This deposit was intended to repay two loans that Mrs. Keeran had made to two of Mr. Keeran's cash-strapped businesses on April 24, 2008. Mrs. Keeran had loaned Llave Enterprises, Inc. $10,000, and Llave Development, Inc. $5,000. *See* Exhibit G, checks number 1015 and 1016. Depositing Mr. Kim's check in Mrs. Keeran's account was consistent with Mr. Keeran's financial practices in the tight credit market, wherein Mr. Keeran was trying to keep his available cash flush enough to weather the imploding real estate market. Mr. Keeran deposited the $65,000 check that Mr. Kim gave him[8] into the bank account for Llave Enterprises, Inc. on May 5, 2008. *See* Exhibit F. Llave Enterprises, Inc. used the funds in part to cover an overdraft on its account and in part to repay a loan from one of the Defendants' sons.

Various business records – bank statements, copies of checks, balance sheets, and general ledgers – were admitted into evidence by both parties. *See, e.g.,* Plaintiffs' Exhibits 4, 6, 11, 18, 33; Defendants' Exhibits F, G. These records demonstrate practices consistent with what was already discussed: a series of loans repaid to family members, which was business in the ordinary course for Mr. Keeran, as the difficult credit markets forced Mr. Keeran to adapt to such unconventional methods given the sudden unavailability of lines of credit. Mr. Keeran made payments to his son, Matthew, who was also in the construction business, to repay an April 2008 loan Matthew made to him. *See* Defendants' Exhibits H. The records also reflect a substantial number of payments made to business vendors. Mr. Keeran, tired of shifting monies between his various companies at this time, actually closed various bank accounts in May 2008 in order to make bookkeeping easier.

---

[7] The check was simply made out to "Bob", which is consistent with the oral nature of the parties' "handshake" deal.
[8] This second check was made out to "Bob Keeran."

Mr. Keeran was trying to adapt his credit-reliant businesses to the wildly shifting winds of the credit market. While Mr. Keeran's actions did not rise to the level of "best practices," the Court was not left with questions about where the Kims' money went.

*Transaction with the Mullers*

The Keerans' Statement of Financial Affairs listed a transfer via deed in lieu of foreclosure of a warehouse located 3228 Los Arboles, Albuquerque, New Mexico (the "Warehouse"). *See* Plaintiff's Exhibit 12. The Warehouse was an investment that Mr. Keeran had made through another of his companies, Los Arboles de Llave, Inc. Los Arboles de Llave, Inc. bought the property for $725,000 in 2005. The Warehouse was appraised at $1.5 million in late 2007. On the basis of this appraisal, Los Arboles de Llave, Inc. borrowed $1 million dollars from First Community Bank in exchange for a lien against the Warehouse. *See* Defendant's Exhibit J. Mr. Keeran used this money to pay off the Warehouse's purchase price and to make tenant improvements. In May 2008, Mr. Keeran mortgaged the property to Gary and Renae Muller, in exchange for a loan of up to $325,000.[9] *See* Defendants' Exhibit K. With interest, the amount owed on the Warehouse thus ultimately totaled approximately $1.4 million. As Mr. Keeran's businesses failed, the one he had planned around the Warehouse was no exception, as some planned tenants never took possession. Mr. Keeran made the business decision to transfer a deed to the Warehouse to the Mullers in lieu of foreclosure in October 2008. The Mullers took the Warehouse subject to the prior mortgage and any other encumbrances. *See* Defendant's Exhibit L. Gary Muller is Mr. Keeran's accountant and friend.

---

[9] The "maximum amounts stated" in the mortgages granting the liens against the Warehouse were double the amounts actually initially borrowed. This is a standard real estate development lending practice in New Mexico based on the peculiarity of New Mexico law. The practice protects the lien priority of the lender in the event of future advances secured by the property or expenses incurred by the lender secured by the lien of the mortgage.

-10-

The appraisal which valued the Warehouse at $1.5 million in November 2007 used sales comparison and income capitalization approaches. Mr. Keeran valued the Warehouse at $1 million on the date of the transfer to the Mullers because of the depressed real estate economy (affecting the sale comparison approach to valuation) and because the actual income from Warehouse tenants was far below what it was projected to be at the time of the appraisal. The Court finds that Mr. Keeran's $1 million valuation of the Warehouse was made in good faith.

***The Second Deal with Mr. Kim Fails and Mr. Keeran Declares Bankruptcy***

Mr. Kim never delivered the $100,000 balance of the purchase price to consummate the Rich Court deal that they made in May 2008. Mr. Kim knew he owed this additional money and would not get the deed to the property until making such payment. The bank that held the lien on the Rich Court lot had advised Mr. Keeran that it would release its lien against the lot in exchange for a cash payment of $100,000, in order to keep the property off its books during a tough credit market and time of increased FDIC scrutiny. Mr. Kim tried to raise the $100,000 balance of the purchase price in various ways. He sought a bank loan, but was turned down.[10] He then sought to sell the aforementioned property in Ventura Village, but was unable to raise the funds that way either.

In late 2008, Mr. Kim asked Mr. Keeran to loan him the $80,000 he had paid toward the purchase price of the Rich Court lot, so that he could help his daughter finance a restaurant in Virginia. Mr. Kim believed his daughter would then sell the restaurant quickly to reap a quick profit, and use the profit to help her father pay the entire $180,000 purchase price for the Rich Court lot. In March 2009, Mr. Keeran signed an $80,000 check to Siekap Kim on behalf of

---

[10] The aforementioned Karen Hall was the loan officer in charge of Mr. Kim's loan application. She had also been the loan officer on at least one of Mr. Kim's previous home financings.

-11-

Llave Development, Inc. *See* Exhibit 25.[11]  Mr. Kim, in order to demonstrate good faith in the deal, executed at least one check in return to Mr. Keeran on that same date, for $20,000. *See* Exhibit E.  The Llave Development, Inc. check bounced, as its bank account contained insufficient funds.  Mr. Kim's check was not negotiated.

Two months later, on May 12, 2009, the Keerans filed a chapter 7 bankruptcy case.  The Court finds that Mr. Kim was still trying to buy the Rich Court property on that date, but had not raised funds to pay the balance of the purchase price.

**DISCUSSION**

In the stipulated pretrial order, Plaintiffs preserved for trial claims asserted under 11 U.S.C. §§ 523(a)(2)(A), 727(a)(3), and 727(a)(5).[12]  Plaintiffs also asserted a claim under 11 U.S.C. § 727(a)(4), but the Court denied that claim at the close of the Plaintiffs' case-in-chief, pursuant to the Defendant's oral motion to dismiss.[13]  Plaintiffs also, in the pretrial order, agreed to limit their recovery sought to $80,000.

---

[11] The check erroneously listed the year as 2008.

[12] Docket No. 64.

[13] The sole ground for such objection preserved in the pre-trial order was an objection on the ground that the Defendants materially undervalued the Warehouse property in their statement of financial affairs. *See* Docket No. 64.  Plaintiffs asserted that Defendants "knowingly and fraudulently made a false oath in connection with the bankruptcy," which is a violation of 11 U.S.C. § 727(a)(4), by undervaluing the Warehouse property that they transferred to the Mullers.  "In order to deny a discharge pursuant to [§ 727(a)(4)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact." *Bishop v. Mulholland (In re Mulholland)*, 2011 WL 4352293 (Bankr.D.N.M. J.Jacobvitz), at *4, *citing Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir.1997).  Plaintiffs here failed to prove that the "debtor….act[ed] deliberately and consciously with an intent to defraud" when they valued the Warehouse property at $1 million on their Statement of Financial Affairs. *Id.* Debtors-Defendants paid $725,000 for the property.  Although they substantially improved the property, circumstances changed considerably after the 2007 appraisal that valued the property at $1.5 million.  The credit markets collapsed, the real estate market tightened considerably, and the income actually derived from the Warehouse was substantially below the projected income at the time of the appraisal.  The Court finds that Mr. Keeran, in scheduling the Warehouse as having a value of $1 million, did not act with an intent to defraud.  After considering the testimony and documentary evidence, and assessing Mr. Keeran's demeanor and credibility, the Court is convinced that it was Mr. Keeran's subjective, good faith belief that the Warehouse had a value of $1 million.  Additionally, and although not necessarily relevant to the false oath claim, the Court finds that had the Warehouse not been transferred to the Mullers via a deed in lieu of foreclosure, there was a strong likelihood that the first mortgage holder would have completed a foreclosure sale and no value would have been available for the Defendants or the bankruptcy estate.

-12-

*Plaintiiffs Have Not Established by a Preponderance of the Evidence that Mr. Keeran Misrepresented that He Owned Lot 4*

Plaintiffs claim that Mr. Keeran obtained $80,000 from them by falsely representing to Mr. Kim in connection with an agreement for the purchase and sale of Lot 4 in the Rich Court development that he, Mr. Keeran, owned the Lot 4 and could convey good title, when in fact he did not own the lot. Plaintiffs assert that Mr. Keeran made this misrepresentation in a desperate attempt to raise money quickly due to his serious financial difficulties. Plaintiffs thereby urge the Court to find that Mr. Keeran owes a non-dischargeable debt to Plaintiffs pursuant to § 523(a)(2)(A). Mr. Keeran maintains that the parties' agreement was for the purchase and sale of Lot 9, not Lot 4. Mr. Keeran asserts that when Mr. Kim's wife later wanted Lot 4 instead, he, Mr. Keeran, agreed to make efforts to swap Lot 9 for Lot 4 with another developer who owned Lot 4.

The legal standard for establishing non-dischargeability of a debt under 11 U.S.C §523(a)(2)(A) is:

> A creditor seeking a determination of non-dischargeability under 11 U.S.C. §523(a)(2)(A) bears the burden of proving, by a preponderance of the evidence, that (1) the debtor made a false representation, (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was justifiable; and (5) the debtor's representation caused the creditor to sustain a loss.

*Cabrera v. Larranaga (In re Larranaga)*, 2011 WL 1344562 at *2 (Bankr.D.N.M. J. Jacobvitz), citing *Fowler Bros v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996) (the required elements under 11 U.S.C. § 523(a)(2)(A) are: "1) [t]he debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was [justifiable]; and the debtor's representation caused the creditor to sustain a loss."); *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d. 351 (1995)

(changing the standard of reliance under 11 U.S.C. § 523(a)(2)(A) from "reasonable" to "justifiable."); *In re Riebesell,* 586 F.3d 782, 789 (10th Cir.2009)(same).  Plaintiffs' claim under § 523(a)(2)(A) fails.

"[T]he preponderance of the evidence standard results in a roughly equal allocation of the risk of error between litigants."  *Grogan v. Garner,* 498 U.S. 279, 286 (1991).  Thus this standard is met if a proposition is more likely to be true than not – the Court must ask: is there a greater than 50% likelihood that a proposition is true.

Plaintiffs did not prove, by a preponderance of the evidence, that Mr. Keeran made a false representation to Mr. Kim.  The parties made a handshake deal for the purchase and sale of a lot in Rich Court by oral agreement.  Mr. Keeran did not make a written representation that he owned or would sell Lot 4 to the Plaintiffs.  No third-party witness testified regarding which lot was the subject of the parties' agreement.  Plaintiffs produced a plat map of Rich Court wherein both Lots 4 and 9 were highlighted.  *See* Plaintiffs' Exhibit 26.  The fact that both lots are highlighted is not dispositive; it at most shows that Mr. Keeran and Mr. Kim at some point discussed both lots.  The Plaintiffs' application for a loan to finance their purchase of the Rich Court lot specifies the lot as "to be determined."  Both the plat map and loan application are consistent with Mr. Keeran's testimony.

The Court finds, after judging the credibility of the witnesses and carefully considering all of the evidence, that Mr. Keeran understood that the agreement between the parties was for the purchase and sale of Lot 9.  Later, after Mrs. Kim decided she wanted Lot 4, Mr. Keeran agreed to sell Lot 4 instead of Lot 9, but only if he could obtain title to Lot 4 by swapping Lot 9 for Lot 4 with another developer who owned Lot 4.  Plaintiffs' claim that Mr. Keeran obtained

$80,000 from them by falsely representing to Mr. Kim he, Mr. Keeran, owned the Lot 4 and could convey good title therefore fails.

Plaintiffs' claim under § 523(a)(2)(A) therefore is denied.

### *Mr. Keeran Did Not Conceal or Destroy Records Concerning the Moneys Plaintiffs Invested*

The Plaintiffs claim that Mr. Keeran failed to provide documentation accounting for the use and disposition of the $80,000 they paid him to purchase the Rich Court lot, and therefore his discharge should be denied pursuant to 11 U.S.C. § 727(a)(3).[14] The Keerans' bankruptcy schedules reflect debts totaling $15,117,793.75.

> Under 11 U.S.C. § 727(a)(3), a debtor is not entitled to receive a discharge if:
>
> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

Denial of discharge under Section § 727(a)(3) requires a showing that 1) the debtor "failed to maintain and preserve adequate records;" and 2) "that the failure made it *impossible* to ascertain [the debtor's] financial condition and *material business* transactions." *In re Brown,* 108 F.3d 1290, 1295 (10th Cir.1997), *citing In re Folger*, 149 B.R. 183, 188 (D.Kan.1992)(emphasis added in *Brown*). Fraudulent intent is not a required element under 11 U.S.C. § 727(a)(3). *See Buckeye Retirement Co., LLC v. Bullough (In re Bullough)*, 358 B.R. 261, 283 (Bankr.N.D.Tx.2007)("the creditor does not have to show intent or recklessness.")(citation

---

[14] This is the sole ground for denial of discharge under 11 U.S.C. § 727(a)(3) that Plaintiffs preserved for trial in the pre-trial order. At trial, Plaintiffs sought to expand their claims under 11 U.S.C. § 727(a)(3). The Defendants objected. The Court ruled in favor of the Defendants on this issue on the ground that Plaintiffs were bound by the pre-trial order, and that expanding the scope of Plaintiffs' claims at trial would be prejudicial to Defendants' presentation of a defense.

-15-

omitted). Nor must the creditor show that the debtor intended to conceal his financial condition. *Meridian Bank v. Alten,* 958 F.2d 1226, 1234 (3d Cir. 1992) (citations omitted).

Plaintiffs failed to establish that the Defendants' discharge should be denied under 11 U.S.C. § 727(a)(3) based on a failure to maintain records. Defendants showed into which bank accounts Mr. Kim's $80,000 was deposited, and provided records that adequately explained why the funds were deposited in those accounts and to what use they made of those funds.

Plaintiffs paid the $80,000 by two checks, one in the amount of $65,000 and the other in the amount of $15,000. The $65,000 check was deposited in a Llave Enterprise, Inc. bank account at a time that the account was overdrawn by $44,512.59. Llave Enterprise, Inc. is the company that owned the Rich Court lot that the Plaintiffs were purchasing, and at the time of the deposit was experiencing severe financial difficulties. The $65,000 was used to cover the overdraft balance, and to repay in whole or in part a loan or loans made by the Defendants' son, Matt, to help his parents keep their businesses afloat. Llave Enterprises Inc.'s bank account for April 2008 reflects thirty-nine deposits, and fifty-one checks honored during the month. The bank account further reflects deposits and credits of $360,712.30, and withdrawals and other debits of $400,414.83 that included two return check fees. Copies of the deposit slips and checks honored for the account for the month are in evidence.

The $15,000 check was deposited in a bank account of Dr. Cynthia Keeran Ph.D. She used the funds to reimburse herself for two checks, both dated April 24, 2008, in the amounts of $10,000 and $5,000 payable to Llave Development, Inc. and Llave Enterprises, respectively. Llave Development, Inc.'s bank account statement for the month of April 2008 reflects a $5,000 deposit on April 24, 2008, thirty-five deposits, and seventy four checks honored during the month. The bank account further reflects deposits and credits of $289,692.90, and withdrawals

-16-

and other debits of $290,310.42 that included twelve return check fees. Copies of the deposit slips and checks honored for the account for the month are in evidence. Llave Enterprises Inc.'s bank account for April 2008 reflects a $10,000 deposit on April 24, 2008.

During 2008, both Llave Enterprises, Inc. and Llave Development, Inc were experiencing severe financial difficulties. Mr. Keeran transferred funds between and among corporate and personal accounts, and borrowed money from his children and friends from time to time, to try to keep the companies afloat. The companies' books reflect intercompany transfers, and transfers to and from the Keerans and their children as loans and repayment of loans. The $80,000 the Plaintiffs paid the Defendants ultimately were used to pay creditors and operating expenses of the Defendants' businesses and to repay loans from a member of the family. The Plaintiffs were aware when they paid the $80,000 that Mr. Keeran and his businesses were in desperate need of cash and would immediately spend the $80,000. The Plaintiffs have not shown that the Defendants have concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which their financial condition or business transactions might be ascertained sufficient to warrant a denial of the discharge.

Plaintiffs made repeated complaints at trial regarding an alleged lack of production of documents needed to trace the $80,000 during the lengthy pre-trial phase of this case. This matter should have been addressed by a motion to compel under Federal Rule of Civil Procedure 37, made applicable here by Federal Rule of Bankruptcy Procedure 7037. Plaintiffs elected not to file such motion.[15]

---

[15] Counsel for Plaintiffs candidly admitted that, for tactical reasons, they chose not to file a motion to compel to obtain the documents in question. Instead, Plaintiffs obtained the documents directly from financial institutions, and argued that the Defendants discharge should be denied because they did not produce the documents by discovery. Under these circumstances, the fact that the Defendants did not produce certain documents in discovery is insufficient to deny the discharge under 11 U.S.C. 727(a)(4). A similar matter was recently addressed in the Bankruptcy Court for the District of New Mexico:

Plaintiffs' claim under § 727(a)(3) is therefore denied.

*Defendants Satisfactorily Explained how their Loss of Assets Rendered Them Unable to Meet their Liabilities*

Finally, Plaintiffs claim that the Defendants have failed to explain satisfactorily the loss of the $80,000 they paid the Defendants, and therefore the Defendants should be denied a discharge pursuant to 11 U.S.C. § 727(a)(5).

Under 11 U.S.C. § 727(a)(5), a debtor is not entitled to a discharge if he or she "has failed to explain satisfactorily, before the determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). The Tenth Circuit has explained this sub-section as follows:

> Under § 727(a)(5), "a bankruptcy court has broad power to decline to grant a discharge ... where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re D'Agnese,* 86 F.3d 732, 734 (7th Cir.1996) (quotation omitted). "Section 727(a)(5) requires a satisfactory explanation which must consist of more than vague, indefinite and uncorroborated assertions by the debtor." *Damon v. Chadwick (In re Chadwick),* 335 B.R. 694, 703 (W.D.Wis.2005). However, "[a]s is the case with Section 727(a)(3), no requirement exists that debtors act fraudulently or intentionally to sustain an objection to discharge based on Section 727(a)(5)." *Shappell's Inc. v. Perry (In re Perry),* 252 B.R. 541, 549 (Bankr.M.D.Fla.2000). On the other hand, "[w]hen deciding whether a debtor's explanation is satisfactory for purposes of Section 727(a)(5), the issue is whether the explanation satisfactorily describes what happened to assets; not whether what happened to assets was proper." *Id.* at 550; *see also Buckeye Retirement Props. of Indiana, LLC v. Tauber (In re Tauber),* 349 B.R. 540, 564 (Bankr.N.D.Ind.2006) (stating that, for purposes of § 727(a)(5), "the debtor does not need to justify the wisdom or prudence in the disposition of assets").
>
> *Testers v. Carlson (In re Carlson),* 2008 WL 8677441, at *5 (10th Cir.2008).

---

Plaintiffs should have addressed the failure to produce the tax return to the Court in the context of a motion to compel production. Then, if Debtor persisted in an unjustified refusal to produce the return, the Court could have taken action at that time. And that action could have included the sanction of defaulting Debtor on the merits. The mere fact of non-production, devoid of any background for the non-production (including whether the non-production was deliberate and avoidable), does not support a finding of a violation of the requirement to maintain records.

*Ryan v. Fox (In re Fox)*, 2007 WL 3166775, at *4 (Bankr.D.N.M. J. Starzynski).

-18-

Under this standard, the basic question before the Court is whether Mr. Keeran was able to satisfactorily explain what happened to the $80,000 in question.  As discussed above, the Defendants provided documentation accounting for the disposition of the funds.  Mr. Keeran gave a detailed explanation concerning the financial difficulties that beset his businesses, the circumstances under which the Plaintiffs paid the $80,000, and how the $80,000 was spent.  The Court finds this explanation satisfactory, and heard no evidence suggesting that the Keerans have secretly sheltered assets from creditors.  Plaintiffs' claim under § 727(a)(5) is therefore denied.

**CONCLUSION**

Plaintiffs' claims on all counts are denied.  An order will be entered forthwith.

                                                                                          /s/ Robert H. Jacobvitz
                                                                                          Robert H. Jacobvitz
                                                                                          U.S. Bankruptcy Judge

Date entered on docket: 4/6/12

COPY TO:

Attorneys for Plaintiffs
Bonnie Bassan Gandarilla
Moore, Berkson & Gandarilla, P.C.
PO Box 7459
Albuquerque, NM 87194

Attorneys for Defendants
Christopher L. Trammell
3900 Juan Tabo NE
Albuquerque, NM 87111-3984

Michael E. Lash
Law Offices of Scott Pistone Ltd. Company
120 Granite Ave NW
Albuquerque, NM 87102-2310